# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Ashley LeBlanc
John Doe
vs. County of San Diego

| | | |
|---|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, a government entity; CHRISTOPHER CADIGAN, an individual; AMBER SPRAGUE, an individual; ASHLEY LeBLANC, an individual,<br><br>Defendants. | ) | Case No. 23-cv-00251-AGS-KSC |

VIDEOCONFERENCE DEPOSITION OF

ASHLEY LeBLANC

Date and Time: Wednesday, September 3, 2025
10:05 a.m. - 1:05 p.m.

Reported By: Terri S. Chicoine, CSR
Certificate No. 10680
Job No. 10171890





EXHIBIT 3

UNITED STATES DISTRICT COURT

Ashley LeBlanc
John Doe
vs. County of San Diego

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, a government entity; CHRISTOPHER CADIGAN, an individual; AMBER SPRAGUE, an individual; ASHLEY LeBLANC, an individual,<br><br>Defendants. | Case No. 23-cv-00251-AGS-KSC |

Videoconference deposition of Ashley LeBlanc taken on Wednesday, September 3, 2025, beginning at 10:05 a.m., before Terri S. Chicoine, Certified Shorthand Reporter, License No. 10680.

APPEARANCES OF COUNSEL:

(All Parties Appearing Remotely Via Zoom)

Ashley LeBlanc
John Doe
vs. County of San Diego

For the Plaintiff:

LAW OFFICES OF STEVE HOFFMAN, APC
BY: STEVE HOFFMAN, ESQ.
1350 Columbia Street, Suite 401
San Diego, California 92101
(619) 677-3015
shoffmanlaw@gmail.com

For the Defendants County of San Diego, Christopher Cadigan, and Amber Sprague:

OFFICE OF COUNTY COUNSEL
BY: TIMOTHY A. HANNA
SENIOR DEPUTY COUNTY COUNSEL
1600 Pacific Highway, Room 355
San Diego, California 92101
(619) 904-0151
timothy.hanna@sdcounty.ca.gov

For the Defendant Ashley LeBlanc:

BQB, LLP
BY: ROBERT QUAYLE, ESQ.
12481 High Bluff Drive, Suite 301
San Diego, California 92130
(858) 788-3900
rquayle@bqblaw.com

Also Present: Vincent Taisague, Zoom Monitor

THE WITNESS: Apologies, Terri.
BY MR. HOFFMAN:
Q No. No. I tend to do that myself. I will make an effort as well.
Did you listen to any audio recordings in preparation for today's deposition?
A No.
Q Let's talk about -- let's see. This was the incident, we'll call it, that happened on May 31st, 2021, involving the Plaintiff.
Do you recall that day?
A Yes.
Q All right. And what was the specific reason that the Plaintiff was brought to your attention?
A A 9-1-1 call was made.
Q And did you receive that 9-1-1 phone call?
A Our San Diego Sheriffs Department dispatch received the 9-1-1 call.
Q All right. Did you hear the 9-1-1 call?
A We were dispatched and given information from dispatch on the 9-1-1 call.
Q Okay. And do you recall what information the dispatcher gave you?
A The address.

**Q Anything else?**
A Yes. The address, the name of the, we call them, reporting party, RP, the -- actually, I don't know what information was initially provided. As I was dispatched it was mental health related, but I don't know what information was in the initial 9-1-1 call.
**Q Okay. And did you make any notes about what the dispatcher told you?**
A The -- no. The dispatcher doesn't -- didn't tell me anything directly. The dispatch call comes through the radio.
**Q Okay. So you just heard the call on the radio; is that correct?**
A Yes.
**Q And in what manner did you respond?**
A We drove to the -- we drove to the house, and I contacted the reporting party by phone.
**Q All right. And when you say "we drove," who did you drive with?**
A Sorry. The deputy.
**Q Do you recall the deputy's name?**
A Cadigan, Deputy Cadigan.
**Q And how did you get the name of the reporting party?**

A Part of the dispatch call.
**Q All right. And then you contacted the reporting party by phone; is that correct?**
A Yes.
**Q All right. And let's see. Do you recall the conversation that you had with the reporting party?**
A Yes, some.
**Q Okay. Let's start with, first, what was her name? I'll help you out. This isn't a memory test. Was her -- to the best of your recollection, was her name Jenna Sykes?**
A Yes.
**Q Okay. And, yes, again this isn't a memory test. If you don't recall, you can tell me that you don't recall.**
A Okay.
**Q All right. And can you tell me either generally or specifically what you discussed with Ms. Sykes?**
A Generally the concern for the Plaintiff and how she received that information and her relationship to the Plaintiff.
**Q Okay. So let's go through those things. How did she receive the information about the**

**Plaintiff?**

A She was told by a second party.

**Q And do you recall who that second party was?**

A Yes.

**Q And was that Mary Curren or Mary Eichs?**

A Mary Eichs is the name that I recall.

**Q Okay. And do you recall what Ms. Sykes told you about the Plaintiff?**

A No.

**Q You have no recollection whatsoever about what she said in general?**

A Her concern for his safety and that the information she received was from a second party.

**Q All right. Do you recall if Ms. Sykes told you whether or not she had spoken to the Plaintiff on that day?**

A I do not recall.

**Q Do you recall asking her that?**

A I don't recall.

**Q Was this phone call made from your cell phone?**

A My PERT cell phone, yes.

**Q And, other than her concern for the safety and that she got the information from another party,**

do you recall anything else about that conversation?
A No.
Q Did you make any notes about that conversation?
A The name and the phone number of the party, the reporting party.
Q Okay. And did you have only one phone conversation with Ms. Sykes?
A Yes.
Q Now, did you contact Mary Eichs?
A Yes.
Q When did you contact her?
A Directly after getting off the phone with Ms. Sykes.
Q Okay. And, again, you contacted her with your PERT cell phone; is that correct?
A Yes.
Q Did you make any notes about that conversation?
A Yes.
Q And where did you make those notes?
A In my notebook.
Q Do you still have that notebook?
A No.
Q And was there a policy in PERT that

**required you to take notes?**

A No.

**Q All right. And so was there a policy with PERT that you would retain any notes that you made?**

A No.

**Q Okay. And can you tell me, to the best of your recollection, what you discussed with Mary Eichs?**

A We discussed her concern for the safety of the Plaintiff.

**Q Okay. And can you be more specific? Do you recall anything that she said to you?**

A Yes.

**Q All right. Can you tell me what she said?**

A She said that he -- her quotes were that he had been depressed and suicidal for several weeks, that members of their church were also concerned and had, she used the term, put him on suicide watch. That was a quote. Again, direct words from her in quotes was that he had told her he had a plan that he had been thinking about -- sorry -- that he had been thinking about hanging himself. She told me that he -- she had contacted him today on the phone, and, again, her words were he sounded desperate and that he had not answered

repeated attempts to talk to her when she called afterwards.

**Q And do you recall anything else that she told you?**

A Yes. I asked about circumstances in his life recent, and she had told me recent loss of job, financial hardship, recent end of relationship.

**Q Anything else?**

A That is all I recall.

**Q All right. Did you ask Mary Eichs about her relationship with the Plaintiff?**

A I don't remember.

**Q Did you -- was it your common practice as a PERT clinician to ask reporting parties about their relationship with the party that they're reporting?**

A Yes. My general practice would be to ask the relationship.

**Q As you sit here today do you know what the relationship between Mary Eichs and the Plaintiff was at the time?**

A I do not know.

**Q Did you -- and you have no recollection of what Mary Eichs said her relationship with the Plaintiff was?**

A The information I received from the third parties.

**Q And so did you find the information you received by the reporting parties to be more credible than the statements made by the Plaintiff?**

A I found the risk factors to give me probable cause that he was a danger to himself.

**Q Okay. And he denied all of these risk factors?**

A Yes.

**Q So you gave more credibility to the reporting party than to the Plaintiff; is that correct? You believed their statements, but not his; is that correct?**

A Yes.

**Q Okay. Can you tell me why you did not believe the Plaintiff's statements?**

A I think I'm having difficulty with the term "believe."

**Q Well, please answer the question to the best of your ability.**

MR. QUAYLE: It's vague and ambiguous, then, because she's unsure what you mean by it. It's vague and ambiguous.

think that was the correct term for me to use.

**Q Okay. You can rephrase it.**

A Okay. Can you repeat the question now? I think I got myself a little tangled.

MR. HOFFMAN: Could you please read it back?

THE REPORTER: "Question: Any of these statements that the Plaintiff made, were any of them a factor in your decision to place him on a hold and transport him?"

THE WITNESS: These were not primary factors in my decision.

BY MR. HOFFMAN:

**Q So would you like to rephrase that?**

A All the information we collect goes into the decision-making process, so I'm having difficulty parsing out, like, in that way of what is -- there's specific information that meets the probable cause.

**Q What is that?**

A The specific information is the information from the reporting parties, including the observations from the deputy.

**Q All right. Did you have any way of verifying the information that the reporting party**

A Yeah.

Q So you testified that during your assessment Plaintiff refused to answer some of the more general questions; is that correct?

A Yes. Open-ended questions, yes.

Q And did Plaintiff's refusal -- did that affect your assessment at all?

A Yes. I shifted to close-ended yes-no questions that were kind of the PERT requirements.

Q Okay.

A Yes.

Q And that inability to get to those more general questions -- well, how did that affect your assessment other than shifting your focus? Did that affect your ability to -- let me ask you this way. Did that affect your ability to assess the Plaintiff, Plaintiff's mental condition?

A Yes. Without having understanding of his perspective and context, it was hard to assess the scenario which are gained through more open-ended not yes-no questions.

Q Based on your training and experience, are there any reasons why an individual might refuse to answer questions during an assessment?

MR. HOFFMAN: Objection; calls for

speculation.

THE WITNESS: I mean, generally speaking with training, relationship with law enforcement, fear, privacy, not wanting us to know the answers.

BY MR. HANNA:

**Q Okay.**

A Generally speaking.

**Q Yeah. And --**

A Discomfort.

**Q I apologize. I didn't mean to cut you off.**

A No. You're good.

**Q Variety of factors.**

**Let me ask you a different way. Based on your training and experience, are there any reasons why an individual might be less than truthful during an assessment?**

MR. HOFFMAN: Objection; incomplete hypothetical, and it calls for speculation.

BY MR. HANNA:

**Q You can answer, Ms. LeBlanc.**

A Generally speaking they don't want you to know the answers to the questions you're asking.

**Q And let me ask it a third way. Based on your training and experience, are there any reasons**

**why an individual might try to hide suicidal ideation during an assessment?**

A Because they don't want you to interfere with their plan to end their life.

**Q In your time as a PERT clinician, are you aware of any instances where an individual denied suicidal ideation and later followed through and ended up committing suicide?**

MR. HOFFMAN: Objection; third-party privacy.

MR. QUAYLE: I will give the same response. If you can answer the question without revealing any personal information, I will let you answer the question.

THE WITNESS: In the question was that narrowed to my experience as a PERT clinician or my experience as a clinician overall?

BY MR. HANNA:

**Q Well, I'll ask you in your experience as a clinician overall.**

A Yes.

**Q Were you aware of such instance at the time of this particular incident?**

A Yes. It was prior to my work with PERT.

**Q Would that knowledge have affected your**

assessment?
A Yes.
Q And let me see if I have any other questions.
It's your role as a PERT clinician to determine that a 5150 hold is warranted; is that correct?
A Yes.
Q Okay. And then after you have made that determination you inform the deputies of your decision; is that right?
A Yes.
Q And the last question. You mentioned, you testified earlier, about a later incident where Plaintiff pointed at you in a vehicle. What did you understand that gesture to mean?
A Threatening.
MR. HANNA: Thank you. That's it for my questions.
MR. QUAYLE: I've got zero questions.
MR. HOFFMAN: All right. In that case, there's no stipulations, so this is federal court, so we'll do everything per the rules, and I suppose that the transcript will be transmitted to the deponent; is that correct?

STATE OF CALIFORNIA ) ss:
COUNTY OF ORANGE )

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

Further, that, if the case is pending in the Federal Court, before the proceedings were transcribed by me, review [X] was [ ] was not required.

I further testify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 5, 2025

TERRI S. CHICOINE, CSR
Certificate No. 10680



EXHIBIT 3