UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

John DOE,

Plaintiff,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.: 23-cv-0251-AGS-GC

**ORDER PARTIALLY GRANTING DEFENSE'S SUMMARY-JUDGMENT MOTION (ECF 90) AND OTHERWISE REMANDING CASE**

This civil-rights lawsuit involves an unwelcome welfare check. Fearing that plaintiff might be suicidal, a friend summoned police to plaintiff's residence to check on him. Plaintiff claims that the responding sheriff's deputies unconstitutionally entered his home, took him into custody, and used excessive force in arresting and handcuffing him. In addition to state causes of action, he sued them and the County of San Diego under 42 U.S.C. § 1983 for violating his civil rights. The defense moves for summary judgment.

**DISCUSSION**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Id.* at 255.

When the "nonmoving party will bear the burden of proof at trial," as here, the party urging summary judgment shoulders the initial burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986). This may be accomplished by "'showing'—that is, pointing out through argument—the absence of evidence." *Fairbank v. Wunderman Cato Johnson*,

212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the nonmoving party to "go beyond the pleadings and identify facts which show a genuine issue for trial." *Id.* at 531.

For the federal claims, plaintiff must also clear an additional hurdle: qualified immunity. That doctrine shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[P]laintiff bears the burden of proof that the right allegedly violated was clearly established." *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (cleaned up). Official actions only violate clearly established law "when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). Caselaw need not have addressed the precise factual scenario, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. When "officers were acting in concert," as here, courts consider "the collective knowledge of all the officers involved in the criminal investigation." *See United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015).

## A. Unreasonable-Search Claim

Plaintiff John Doe first alleges that, when responding to the welfare-check request, the San Diego County sheriff's deputies unlawfully "entered the curtilage of Plaintiff's home, peered into his windows, entered his home, and searched Plaintiff's person and home." (ECF 52, at 6.) The deputies rely on the "emergency aid exception" to excuse their warrantless entry and both consent and reasonable suspicion to justify their frisk of plaintiff's person for weapons. (ECF 90-1, at 20, 22.)

### 1. *Search of Home*

Although "searches and seizures inside a home without a warrant are presumptively unreasonable," "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). To qualify for this "emergency

assistance" exception, the deputies' behavior must satisfy "a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Like "other exceptions to the warrant requirement, the Government bears the burden of demonstrating that the search at issue meets these parameters." *Hopkins v. Bonvicino*, 573 F.3d 752, 764 (9th Cir. 2009).

a. *Immediate Need for Emergency Assistance*

First, did the deputies have objectively "reasonable grounds to believe that there [was] an emergency at hand and an immediate need for their assistance for the protection of life or property"? *See Martin v. City of Oceanside*, 360 F.3d 1078, 1081 (9th Cir. 2004); *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (noting that *Martin*'s emergency-aid test has since been modified, but its "reasonable grounds prong" survives). To answer that question, it's instructive to review the similar case of *Martin*, in which a "father phoned the police stating that he was urgently concerned for the welfare of his daughter, and that she may be 'in trouble' inside the house." *Id.* at 1082. In addition to this phone call, the responding officers in *Martin* saw the daughter's and a roommate's "cars" "in the driveway"; got no "response to repeated knocking"; made "an unanswered call to [her] phone"; and learned from a neighbor that the daughter and her roommate "should be home." *Id.* On these facts, the Ninth Circuit held that the officers had a "reasonable belief that they had a duty under the community caretaking function to investigate a potential emergency situation." *Id*. at 1082.

If anything, the evidence that there was an immediate emergency is stronger here than in *Martin*. Before entering plaintiff's property, the deputies in our case had information from three people who seemed to know plaintiff well: Mary Eichs (sometimes referred to as Mary Kearns), who was part of plaintiff's "church" and had spoken with him "on the phone" that day; Jenna Sykes, who originally called 911 to request the wellness

check and provided plaintiff's address and gate code; and one of plaintiff's neighbors. (*See* 106-3, at 5, 11; Ex. 7/Cadigan BWC, at ticker 8:08; Ex. 8/Spinelli BWC, at tickers 11:40, 21:50.) From these three sources, the deputies understood that: (1) Eichs and Sykes knew plaintiff and were "concern[ed]" about him; (2) Eichs was worried that plaintiff "had a plan" to commit suicide by "hanging"; (3) Eichs reported plaintiff's "recent loss of job, financial hardship, [and] recent end of [a] relationship"; (4) plaintiff's church had him on "suicide watch"; and (5) the neighbor just "saw [plaintiff] come home." (ECF 106-3, at 5, 8, 10–11; ECF 106-4, at 6; Ex. 8/Spinelli BWC, at ticker 11:40; Ex. 7/Cadigan BWC, at ticker 8:08).

Once the deputies approached the home, their reasons for concern only grew. Plaintiff did not answer multiple efforts to get his attention by knocking on the door, ringing his doorbell, and calling his name. (Ex. 8/Spinelli BWC, at tickers 4:22, 7:20, 9:00, 10:15.) Nor did he answer "repeated attempts" to reach him by phone. (ECF 106-3, at 10–11.) The deputies also "walked around the back of [plaintiff's] fence" and noticed "there was a sheet or blanket covering a doorway." (ECF 106-5, at 6.) That detail was alarming because "typically on a suicidal call, a suicidal person will try to hide where they're committing suicide." (*Id.*) After close to ten minutes of these efforts, one deputy feared that they may have been "too late." (*See* Ex. 8/Spinelli BWC, at ticker 11:00.)

The deputies have thus satisfied the first prong "of the [emergency-aid] analysis," which is "the core" of the test. *See Hopkins*, 573 F.3d at 763; *cf. Bonivert v. City of Clarkston*, 883 F.3d 865, 877 (9th Cir. 2018) (ruling that the emergency-aid exception did not apply when the officer "offered no objectively reasonable basis to suggest that [plaintiff] could harm a third party" nor "that [plaintiff] was a harm to himself, other than that [plaintiff] was hiding from officers inside the house" (cleaned up)).

b. *Reasonable Scope and Manner*

The analysis of the emergency-aid exception's second prong is even more straightforward: the "scope of their search" was "reasonable and confined to the areas of the house likely to include individuals in harm's way." *See Snipe*, 515 F.3d at 954. Using

the lock code provided by the 911 caller, the deputies opened a side gate and accessed the backyard and then the home; they encountered plaintiff in a hallway by the first and only room they entered; and then they stopped searching the premises. (*See* Ex. 8/Spinelli BWC, at ticker 15:50.)

Thus, the deputies' warrantless search of plaintiff's home to perform a welfare check was justified by the Fourth Amendment's emergency-aid exception.

**2. *Search of Person***

Turning to the protective search of plaintiff's person, the defense argues that the deputies could reasonably presume it was allowed as a *Terry* frisk for weapons and due to plaintiff's own consent. (*See* Ex. 7/Cadigan BWC, at ticker 13:10 (plaintiff: "pat me down, get your *Terry* search over with"); *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968). In other words, the defense contends that it was not "clearly established" that a frisk of plaintiff's body after his involuntary psychiatric detention would violate the Fourth Amendment. Plaintiff does not argue otherwise. Although this issue is perhaps better analyzed as a search incident to arrest, the Court agrees that the deputies have qualified immunity from suit regarding the frisk of plaintiff's person.

In sum, plaintiff has not cited any case that suggests the deputies' search of his home or person violated clearly established law. On plaintiff's unreasonable-search claim, summary judgment is granted for the defense.

**B. Unreasonable-Seizure Claim**

Plaintiff next asserts that the deputies unconstitutionally "seized and detained [him], without probable cause, despite the fact that he had committed no crime and had no mental health disorder." (ECF 52, at 6.) The deputies counter that they had "probable cause" to hold plaintiff for a "mental health evaluation," based on both "the assessment of a social worker clinician" and "personally observed facts and circumstances suggesting suicide risk." (ECF 90-1, at 17.)

Under the Fourth Amendment, "seizure of the mentally ill" on their own property "is analogous to a criminal arrest and must therefore be supported by probable cause."

*Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended on denial of reh'g*, (Apr. 1, 1992). And California state law specifically authorizes probable-cause arrests of the dangerously mentally ill: "When a person, as a result of a mental health disorder, is a danger to" himself or herself, "a peace officer," "professional person designated by the county," or other specified officials "may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours[.]" Cal. Welf. & Inst. Code § 5150(a). For the purposes of such an involuntary psychiatric hold, "[p]robable cause exists . . . if facts are known to the officer that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself." *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (cleaned up). "To justify the detention, the officer must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion." *Id.* (cleaned up). The officer, "however, is not required to make a medical diagnosis of mental disorder." *People v. Triplett*, 144 Cal. App. 3d 283, 288 (Ct. App. 1983). "It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder, either temporary or prolonged." *Id.*

Many of the facts known to the deputies supported a probable-cause "seizure" to ensure plaintiff's safety. As discussed, they had reports that two people in plaintiff's life were "concern[ed]" about him; his church had him on "suicide watch"; a member of his church was worried that he "had a plan" to commit suicide by "hanging" that day; and plaintiff was currently grappling with the "loss of [a] job, financial hardship, [and the] recent end of [a] relationship." (ECF 106-3, at 5, 8, 10–11; Ex. 8/Spinelli BWC, at ticker 11:40; Ex. 7/Cadigan BWC, at ticker 8:08.) In addition, plaintiff did not answer the knocks at his door, despite a neighbor's suggestion that he was home, and a deputy noticed a potentially suicide-hiding "sheet or blanket covering a doorway." (Ex. 8/Spinelli BWC, at tickers 4:22, 7:20, 9:00, 10:15; ECF 106-5, at 6.) Of course, when the deputies did encounter plaintiff, he told them that he was "listening to music" and that he was just

"doing" "laundry." (*See* Ex. 7/Cadigan BWC, at ticker 10:17; ECF 109-4, at 4.) That explanation somewhat dispels the concerns about plaintiff not answering the door, and it shows he was not presently in the process of harming himself. But it does not override the other worrying facts, which otherwise suffice to "entertain a strong suspicion" that plaintiff might commit suicide, that is, that he was then "mentally disordered" and "a danger to himself." *See Bias*, 508 F.3d at 1220 (cleaned up). So, even if plaintiff was "seized" for Fourth Amendment purposes when the deputies handcuffed him, they had probable cause to do so. *See United States v. Martin*, 509 F.2d 1211 (9th Cir. 1975) (finding "probable cause" even when some of the evidence uncovered was "innocuous").

The ensuing events did not dissipate that probable cause. After plaintiff was cuffed, he answered the county clinician's questions in ways that were at turns reassuring and worrisome. On the one hand, plaintiff appeared calm for most of that discussion. He even said that he "plan[ned] on outliving [his] parents" and had "no intent to harm [him]self or anyone else." (Ex. 8/Spinelli BWC, at tickers 23:40, 24:29.) On the other hand, when asked whether he "ever thought about wanting to end his life before," he deflected, saying: "[W]e're not at a point where we have thought police in this country." (Ex. 8/Spinelli BWC, at ticker 24:00.) Also, plaintiff seemed to avoid the clinician's "open-ended" questions, forcing her to shift to "close-ended yes-no questions." (ECF 106-3, at 14.) This response suggested to the clinician that plaintiff may be trying to "hide suicidal ideation," as suicidal people often "don't want you to interfere with their plan to end their life." (*Id.* at 15–17.) Given all that the clinician then knew—including plaintiff's proximity to a "belt" that he might use to hang himself—the clinician opted to take plaintiff "to a doctor" for further evaluation. (Ex. 8/Spinelli BWC, at ticker 34:00.)

Thankfully, plaintiff never harmed himself—as he insisted he wouldn't and as the specialist later concurred after a more extensive evaluation. (*See* ECF 106-7, at 5.) But probable cause is judged based on "the facts known to the arresting officer at the time of arrest," without the benefit of 20/20 hindsight. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause does not mean certain cause, and the purpose of the psychiatric

evaluation is to have professionals skilled at evaluating mental state take some responsibility for assessing whether [plaintiff] was in danger." *Palter v. City of Garden Grove*, 237 F. App'x 170, 171 (9th Cir. 2007). Throughout the relevant interaction with plaintiff, the deputies had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the "strong suspicion" that he was "mentally disordered" and a "danger to himself." *See Bias*, 508 F.3d at 1220. Thus, summary judgment is granted for the defense on the unreasonable-seizure claim.

**C. Excessive-Force Claim**

Next, plaintiff contends that the deputies used unreasonable force while taking him into custody, including "pointing a firearm" at him, "handcuffing" him, and then "refusing to loosen his handcuffs." (ECF 52, at 7.) In an excessive-force case, the Fourth Amendment inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Also, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. "In determining the need for force, we pay careful attention to the facts and circumstances of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (cleaned up)

**1. *Firearm-Pointing***

Plaintiff alleges that Deputy Amber Sprague pointed her gun at him.[1] (*See* ECF 52, at 4, 7.) Deputy Sprague concedes that she "unholstered" her "firearm," but testified that

---

[1] Plaintiff actually claimed that multiple deputies were "pointing guns" at him. (*See, e.g.*, ECF 109-4, at 3 (Q: "Were they pointing guns at you . . . ?" A: "Absolutely.").) At the

she only "held it at a low ready just outside [her] holster" and "never pointed up at [plaintiff]." (ECF 106-6, at 4.) The video footage never shows Sprague pointing her weapon directly at anyone, but she is off camera during this encounter for about a second.

"[P]ointing guns at persons who are compliant and present no danger is a constitutional violation." *Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018); *see also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc). Viewing the evidence in the light most favorable to plaintiff, as we must, Deputy Sprague could have pointed her sidearm at plaintiff during the brief and crucial second or so when she is not visible on camera. The problem for plaintiff is that—at that moment—a reasonable officer would have objectively thought that plaintiff was not complying and might present a danger. Under those circumstances, a reasonable officer would be objectively justified in raising her weapon, at least briefly, to be ready to defend herself or others.

Let's revisit the situation Deputy Sprague confronted before she (arguably) leveled her firearm at plaintiff. At first, plaintiff had not replied to multiple attempts to get him to come out—phone calls, knocking, doorbell-ringing, yelling his name. When the deputies moved to the backyard and finally got a response, plaintiff remained inside and largely out of sight in the hallway adjoining the back bedroom. Perhaps understandably, he objected to the officers being on his property and made this known as they were talking to him through the door. But plaintiff's behavior did nothing to quell the deputies' objectively reasonable belief that he was suicidal and posed a danger at least to himself.

---

summary-judgment stage, "facts must be viewed in the light most favorable to the nonmoving party," but the Court need not accept a "version" that is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The video evidence confirms that the other officers never unholstered their weapons during the relevant timeframe. (*See, e.g.*, Ex. 6/Sprague BWC, at ticker 12:40 (Deputy Spinelli's gun holstered); Ex. 8/Spinelli BWC, at ticker 15:42 (same for Deputy Cadigan).) In fact, plaintiff seemingly concedes as much by arguing in his summary-judgment opposition that there is a factual dispute only "as to whether *Sprague* pointed her gun." (*See* ECF 94, at 9 (emphasis added).) The Court thus focuses its analysis on Deputy Sprague.

Then came the key sequence, when the deputies saw plaintiff fully for the first time: He suddenly walked across the room, lifted a pillow, and grabbed something from underneath. (Ex. 7/Cadigan BWC, at ticker 12:08.) Meanwhile, Deputy Sprague unholstered her pistol. (Ex. 8/Spinelli BWC, at ticker 15:31.) About two seconds later, she pointed it at the ground. (*Id.* at 15:33.) In one of those two intervening seconds, the firearm was out of the camera's frame. During that off-camera moment, Deputy Sprague could have aimed her weapon at plaintiff before quickly lowering it.

In the next instant, after plaintiff grabbed the unknown object, he announced, "look, it's my phone." That certainly made the situation seem less threatening. But by then, Deputy Sprague's sidearm was indisputably facing groundward, and later she re-holstered it. The reasonableness of any gun-pointing must be judged by what was known to the deputies before they learned that unidentified object was a phone. At that critical time, it would have been objectively reasonable for Deputy Sprague to briefly raise her weapon defensively. And she could also reasonably keep it aimed at the potentially suicidal individual—who seemed upset that officers were there—until she learned what hidden item he was rummaging for.

In short, the weapon-brandishing here did not run afoul of the Fourth Amendment. At any rate, plaintiff has not offered any authority that suggests Deputy Sprague's conduct violated clearly established law. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). So, summary judgment is granted for the defense on the firearm-related aspect of the excessive-force claim.

**2. *Handcuffing***

The remainder of plaintiff's excessive-force claim centers on the deputies' "handcuffing" him and "refusing to loosen his handcuffs," causing "bodily injury." (ECF 52, at 5, 7.) But plaintiff has not come forward with any "existing precedent" that

"squarely governs the specific facts at issue" here, so the deputies have qualified immunity. *See Kisela*, 584 U.S. at 104.

Plaintiff points to *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), as clearly establishing that "officers' refusal to address the plaintiff's complaints" about "tight handcuffing" may "constitute excessive force." (ECF 94, at 10.) But, for a couple reasons, a reasonable officer would not think *LaLonde* squarely prohibited the conduct here. First, in *LaLonde*, the police refused to untighten plaintiff's handcuffs or offer "any first aid whatsoever." *Id.* at 952. By contrast, when plaintiff Doe specifically requested that the deputies "loosen up the handcuffs," they promptly did so.[2] (Ex. 8/Spinelli BWC, at ticker 20:10.) Later, they linked two pairs of handcuffs together—fastening each pair to one of plaintiff's wrists—to add extra slack for his comfort. (*See id.* at 38:50.)

Second, *LaLonde*'s facts are much harsher. There, the handcuffing prevented plaintiff LaLonde from wiping pepper spray off his face, which "burned . . . like it was on fire." *LaLonde*, 204 F.3d at 952. When he protested that the tight handcuffs were "cutting off my circulation," the officers told him that "if he would only hold still, he would be fine." *Id.* LaLonde explained that he couldn't keep still because "the pepper spray was burning like hell." *Id.* The officers replied that pepper spray "wasn't all that bad." *Id.* at 952 n.6. They left him on the couch, unaided, for "twenty to thirty minutes," when "two other police officers arrived" and finally wiped his face. *Id.* at 952 n.6. The next day, LaLonde "sought medical treatment." *Id.* at 953. Up until trial, he continued to experience occasional arm and hand numbness, which he had never suffered "before the incident." *Id.*

---

[2] Plaintiff made several appeals to remove the handcuffs altogether, which the deputies declined to do. (*See* Ex. 8/Spinelli BWC, at ticker 17:40 (plaintiff: "the handcuffs have got to go" and are "pinching my nerve"); *id.* at 18:50 ("remove the handcuffs"); *id.* at 19:30 ("I'm asking you to please take the handcuffs off. Look, you're hurting me. They hurt. They're pinching my nerves. I'm asking them to please remove the cuffs.").) But the officers were not constitutionally required to release plaintiff from restraints. Then, just over three-and-a-half minutes after being cuffed, plaintiff specifically asked the officers to "loosen up the handcuffs," which they did. (Ex. 8/Spinelli BWC, at ticker 20:10.)

By comparison, the deputies here were more responsive, and plaintiff Doe endured lesser injuries. In total, Doe was detained in tight handcuffs for about four minutes before the deputies loosened them, and then for an additional 18 minutes until they slackened it further with the double cuffs. Plaintiff "didn't receive any formal treatment" for his handcuff-related pain. (ECF 106-7, at 6.) And even when he consulted with "medical-practicing family members about [his] wrist injury," no treatment was recommended—he "was told that it would, hopefully, just subside over time and go away." (*Id.* at 7.)

It is not clear that plaintiff has even raised a triable issue of fact, as the excessive-force cases that survive summary judgment typically involve "significantly more force," "greater injuries to the hands," or "refusals . . . to loosen handcuffs." *See Stevenson v. Jones*, 254 F. Supp. 3d 1080, 1091 (N.D. Cal. 2017). But, at a minimum, it was not clearly established that the handcuffing here amounted to excessive and unconstitutional force. *Cf. Gonzalez v. County of Los Angeles*, No. 22-55386, 2023 WL 5951015, at *2 (9th Cir. Sept. 13, 2023) (holding that it was not "clearly establish[ed]" that "handcuffing that produces some pain and discomfort and leaves red marks on one's skin" "constitutes excessive force"). So defendants have qualified immunity on the handcuff-related allegations.

Thus, summary judgment is granted for the defense on the Fourth Amendment excessive-force claim in its entirety.

**D. State-Law Claims**

As all federal claims have now been disposed of, the Court must consider whether to keep jurisdiction over the unresolved state-law causes of action. "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks*, 625 F.3d 550, 561 (9th Cir. 2010). Neither party has explained why the "balance of factors" would favor retaining jurisdiction here, so the Court remands the remaining claims to state court.

## CONCLUSION

The Court orders as follows:

1. The defense's summary-judgment motion is **GRANTED IN PART**. The defense is granted summary judgment on the three federal causes of action:

- Unreasonable seizure of the person (count 1);
- Unreasonable search (count 2); and
- Unreasonable force (count 3).

Otherwise, the defense's summary-judgment motion is **DENIED** as moot.

2. The remaining claims are **REMANDED** to the Superior Court of California for the County of San Diego, Central Division.

3. The Clerk must issue a judgment and close this case. Other than the deadlines regarding sealing motions, any pending deadlines and hearings are vacated.

Dated: September 18, 2026

Hon. Andrew G. Schopler
United States District Judge